

40 North Central Avenue, 19th Floor
Phoenix, Arizona 85004-4429
Telephone: (602) 262-5311

Susan M. Freeman, State Bar No. 004199
Direct Dial: (602) 262-5756
Direct Fax: (602) 734-3824
E-mail: SFreeman@LRLaw.com

Scott K. Brown, State Bar No. 020390
Direct Dial: (602) 262-5321
Direct Fax: (602) 734-3866
E-mail: SBrown@LRLaw.com

*Attorneys for Concentric Energy Corp.*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In Re: | Chapter: 7 |
| CONCENTRIC ENERGY CORP., | Case No. 2:10-bk-18796-SSC |
| Debtor. | **CONCENTRIC ENERGY CORP.'S MOTION TO DISMISS INVOLUNTARY PETITION** |

Concentric Energy Corp. ("Concentric") hereby moves to dismiss the Involuntary Petition filed by John P. O'Shea, Richard Louise, AWM Holding, LLC, David R. Holbrooke and Blue Sky Securities Ltd. (collectively, the "Petitioners"). The Petitioners do not have standing to bring the Involuntary Petition and the Involuntary Petition fails to state a claim for relief.

This Motion is supported by the following Memorandum of Points and Authorities and the record before this Court.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### I. INTRODUCTION

The Petitioners' motivation for filing the Involuntary Petition is clear – they are trying to stall or block a duly authorized and valid joint venture agreement Concentric entered into April 2010. In order to file the Involuntary Petition, they created alleged defaults under a Convertible Debenture, defined below, and thereby purported to accelerate their debentures otherwise not due until December 31, 2012. Concentric



1  vigorously disputes the validity of claims of the Petitioners, and is filing a separate
2  Answer and Counterclaims against the Petitioners seeking damages for bad faith filing.[1]
3        The Petitioners also contend that Concentric will owe $50,000 to the Bureau of
4  Land Management, due on August 30, 2010, and it will not have the means to make this
5  payment.  Concentric strongly disagrees.  Either it, or its joint venture partner, will have
6  the ability to pay the $50,000 when it comes due, but be that as it may, speculation that a
7  debtor will not be able to pay a future liability is insufficient grounds for filing an
8  Involuntary Petition.  Regardless, the Court does not have to reach this issue and should
9  dismiss the Involuntary Petition immediately if it agrees that the Petitioners' claims are the
10 subject of a *bona fide* dispute.

11 **II.   FACTUAL BACKGROUND**

12       The Petitioners filed the Involuntary Petition on June 16, 2010.  All of the
13 Petitioners are holders of debentures under the "15% Cumulative Convertible Debenture
14 Due December 31, 2012" ("Convertible Debenture").  The debentures do not mature until
15 December 31, 2012.

16       Shortly after filing the Involuntary Petition, the Petitioners filed a *Motion For*
17 *Appointment of Interim Trustee* [DE 14] (the "Trustee Motion").[2]  The Trustee Motion is
18 supported by the *Declaration of John O'Shea in Support of Motion for Appointment of*
19 *Interim Trustee* (the "O'Shea Declaration"), attached as Exhibit A to the Trustee Motion,
20 and numerous documents attached as Exhibits B-L.  These Exhibits presented by the
21 Petitioners demonstrate the very reason their claims are in *bona fide* dispute.

22 . . .
23 . . .
24 . . .

---

[1] If this Motion is granted, a trial will still be required on Concentric's Counterclaims.  This Motion is made without prejudice to Concentric's claim for damages including attorneys' fees and costs and punitive damages against the Petitioners.

[2] This Motion references the Trustee Motion and Exhibits solely to illustrate what the Petitioners knew prior to filing the Involuntary Petition.  Concentric disputes the factual inferences the Petitioners draw from those documents and intends to oppose the relief sought by the Trustee Motion.



### A. The Current Economy Has Hampered Concentric's Ability To Financially Prosper

Concentric filed a "Form S-1 Registration Statement" with the SEC in an attempt to publicly trade its stock. It was filed on December 31, 2008 – in the middle of the worst financial crisis the United States has ever seen.[3] Concentric filed an "Amendment No. 1 to Form S-1 Registration Statement" (the "Amended Registration Statement") on August 10, 2009.[4] Unfortunately, the appetite for public offerings in 2009 was not much better than in 2008,[5] and Concentric's primary asset, a uranium mine, continued to decline in value.[6]

The SEC issued comments to the Amended Registration Statement on January 9, 2010.[7] Given its inability to raise money during the second half of 2009, Concentric recognized it no longer had the financial means to pursue a public listing of its stock. On January 11, 2010, it provided a Shareholder Update to that effect:

> Concentric failed to raise funds in the second half of 2009. The Company continues to seek financing but has focused on sale and merger alternatives including reverse takeover opportunities. . . . With minimal cash in our Treasury, we do not have the resources to complete and sustain a going public effort. The principal risk is that we will not have sufficient funds to pay our next BLM claim fee, about $50,000, in August 2010.

---

[3] This first Registration Statement can be located on the SEC's website. A discussion of the 2008 IPO market can be found at http://www.renaissancecapital.com/ipohome/Review/2008main.aspx ("[T]his year's unprecedented financial crisis caused global IPO issuance to come to a near halt in mid-2008. The few stocks that managed to go public performed poorly and were pulled down further by the broader markets.")

[4] A copy of the Amended Registration Statement is attached as Exhibit B to the Trustee Motion. The Amended Registration Statement contains an extensive history of Concentric, including its corporate history, management, salaries of officers and directors, previous private placements, capital availability, and the rise (and subsequent decline) of the value of uranium, Concentric's primary asset.

[5] *See* http://stocks.investopedia.com/stock-analysis/2009/The-Worst-IPOs-Of-2009-CPC-VITC-CPIX-OMER-CDIC1216.aspx ("Many pundits preached the return of the IPO market in 2009, as the number of IPO deals hit 58 in 2009, raising $23.6 billion. While this was certainly better than the dark days of 2008, this was the lowest number of issues going back as far as 1999, according to Renaissance Capital."). Those companies that did go public were typically the larger ones, like VISA, not smaller companies like Concentric. *Id.*

[6] The Amended Registration Statement shows the decline in value for uranium.

[7] *See* Exhibit I to the Trustee Motion at 2.



|   |   |
|---|---|
| 1 | Concentric raised about $5 million in private money in mid 2007 when uranium prices peaked at over $130/lb., with a view to taking the Company public in Toronto. The Company prepared the requisite NI-43101 and was drafting US and Canadian securities filings when the uranium new issue window closed in December 2007. The new issue window for uranium junior stocks has remained, for all intents, shut down the last two years. We changed boards, management and strategy in December 2007 then on the heels of the stock market decline repurposed the Company to focus on a lower cost mine plan and diversification through acquisitions. With this new platform we raised just over $2 million during through May 2009. During the summer of 2009 uranium prices fell from over $50 to a trough of $42/lb., and prices are now about $45/lb. Market sentiment regarding uranium juniors is unfavorable at the moment. We are not optimistic about raising new funds. We will continue to review merger, sale and other opportunities.[8] |

With Concentric looking for a new direction, its Board of Directors returned control of the company to Ralph Kettell,[9] who was the founder of the company, but had not been actively involved in the company since 2006.[10]

**B.  Concentric Enters Into A Joint Venture In Order To Preserve The Value Of The Company**

Shortly after Mr. Kettell become the Chairman and CEO of Concentric in April 2010, Concentric entered into an "Option and Joint Venture Agreement" with Global Uranium Corp. ("Global") (the "Global Agreement").[11] Although the Trustee Motion does not attach a copy of the Global Agreement, it is clear that the Petitioners were aware of the terms before they sent their Default Letters and filed the Involuntary Petition. Specifically, Global issued a press release on April 16, 2010, stating among other things: "[Global] acquired the right to incrementally earn up to a 70% interest in and to 280

---

[8] A copy of the Shareholder Update is attached to the Trustee Motion as Exhibit D.
[9] Mr. Kettell is not "merely" a shareholder of Concentric, as contended in the Trustee Motion, ¶ 14. He owns or controls 30% plus of the shares of Concentric and is a debenture holder of $103,000 of original investment and his ex-wife also holds $11,573 of the debentures.
[10] *See* Exhibits E and H to the Trustee Motion.
[11] A copy of the Global Agreement is attached hereto as **Exhibit 1**.



contiguous, unpatented lode mining claims located in Yavapai County."[12] On May 24, 2010, Mr. Kettell sent to shareholders a letter describing the transaction.[13] Mr. Kettell's letter explains:

> In a nutshell we've created a step-by-step means to get Concentric security holders liquid, over a period of time, via a joint venture arrangement with Global Uranium. Here are the key terms. Global can acquire a 70% interest in earned increments over a six (6) year period:
>
> Global will
>
> 1) pay US$80,000 on signing;
>
> 2) issue 11,300,000 shares incrementally over a 6 year period
>
> 3) conduct a minimum of US$2 million of exploration work on the Anderson Property, on or before the 5th anniversary of the Effective Date of the Agreement.
>
> 4) issue 1,200,000 shares to Concentric on the Effective Date of the Agreement and conduct a minimum amount of US$200,000 [of exploration] on the Anderson Property in the first year.
>
> By issuing shares each year on the anniversary of the Effective Date and by performing the minimum exploration program to a maximum amount of US$2,000,000, Global will earn a 20% undivided interest at the end of first year; a 15% undivided interest at the end of the second year; a 16% undivided interest at the end of the third year; a 9% undivided interest at the end of the fourth year and a 10% undivided interest at the end of the fifth year.

. . .

. . .

. . .

---

[12] The Trustee Motion states that the Petitioners were aware of the press release prior to sending out their Default Letters and filing the Involuntary Petition. Trustee Motion, ¶ 18. A copy of the press release is attached to the Trustee Motion as Exhibit F.

[13] See Exhibit H to the Trustee Motion.



In other words, the Global Agreement does not directly transfer Concentric's assets. Instead, it is a gradual process that may or may not happen, depending on various contingencies.

Further, the Global Agreement is not yet effective – a fact the Petitioners know. The O'Shea Declaration states: "I was informed by the TSX Venture that in order for the GU to issue shares, GU was required to obtain TSX Venture approval, which TSX had not yet given" (O'Shea Declaration, ¶ 28). Global's April press release also stated: "The terms of acquisition are subject to prior TSC Venture Exchange approval." The Global Agreement, itself, provides:

> 9.24  <u>Effective Date</u>.  The terms of this Agreement are subject to prior filing with the TSX Venture Exchange and approval by the Board of Directors of Concentric.  The later of the date of the TSX Venture Exchange issues a Notice that the Agreement has been accepted for filing or that the members of Concentric shall have approved this Agreement shall for the purposes of this Agreement be the "Effective Date".  Each party agrees to diligently pursue such acceptance and approval.[14]

Concentric's Board has approved the Global Agreement, and Global and Concentric are diligently pursuing all other acceptances and approvals. Concentric believes it will have shareholder approval of the Global Agreement by the end of this month, although it does not believe such approval is necessary for the effectiveness of the Global Agreement. The Involuntary Petition apparently is intended to stall or block the Global Agreement from becoming effective.

**C.   The Petitioners' Claims Are Tenuous At Best**

By letter dated May 25, 2010, John P. O'Shea ("O'Shea") put Concentric on notice of certain alleged defaults under the Convertible Debenture and purported to accelerate his debenture (the "O'Shea Letter"). According to the O'Shea Declaration, O'Shea is currently the Chairman and CEO of Westminster Securities Corporation

---

[14] *See* **Exhibit 1**, § 9.24, attached hereto.



1  ("Westminster").[15]  Not mentioned in the O'Shea Declaration, but explained in substantial

2  detail in the Amended Registration Statement, is that Westminster played a large part in

3  raising $7 million for Concentric.[16]  It appears that Westminster has been terminated or

4  withdrew its registration with the SEC on March 9, 2009, due in part to 13 securities

5  violations issued against Westminster.[17]

6  Upon information and belief, O'Shea is the primary individual who opposes the

7  Global Agreement, but he has enlisted other debenture holders to join his cause.  By letters

8  dated June 2, 2010, AWM Holding LLC, Richard Louise, David R. Holbrooke and Blue

9  Sky Securities Ltd. put Concentric on notice of certain alleged defaults under the

10  Convertible Debenture and purported to accelerate their debentures (together with the

11  O'Shea Letter, the "Default Letters").[18]  The June 2, 2010 letters are almost word for word

12  the same as the O'Shea Letter.[19]

13  All of the Petitioners' claims are based upon alleged defaults under the Convertible

14  Debenture.  The Default Letters cite the following language from the Convertible

15  Debenture:

16  <u>Section 8</u>.     <u>Events of Default</u>

17  b.     <u>"Event of Default"</u> means, wherever used herein, any
         of the following events . . .
18

19  ix.    if while at least 33% of the original Purchase
         Amount of these Debentures shall remain
20       outstanding, unless approved by the holders of
         50.1% of the shareholders of the Common
21       Shares of the Company, the Company shall be a
         party to any Change of Control Transaction or
22       Fundamental Transaction or shall agree to sell
         or dispose of all or in excess of 33% of its
23       assets in one transaction or a series of related

24

25

---

26  [15] *See* Exhibit A to the Trustee Motion, ¶ 2.
    [16] *See* Exhibit B to the Trustee Motion at pp. 2-3.
27  [17] *See* **Exhibit 2** attached hereto.
    [18] A copy of the O'Shea Letter is attached as Exhibit I to the Trustee Motion.
28  [19] Copies of the Default Letters are attached hereto as **Exhibit 3**.



| | |
|---|---|
| | transactions (whether or not such sale would constitute a Change of Control Transaction); |
| x. | subject to the Company's obligation to use commercially reasonable efforts to have its Common Stock traded on a Trading Market, if, while this Debenture remains outstanding, and subsequent to attaining an initial listing or quotation on a Trading Market, the Company's Common Stock ceases to be traded on a Trading market for 10 consecutive Business Days or more during any 12 month period;[20] |

The Default Letters explain the defaults this way:

> The proposed Joint Venture presented to the TSX between Concentric Energy Corp. (Concentric) and Global Uranium Corporation (GU) entered into on April 15th, 2010 creates an acceleration of my Debenture on several sections with my Debenture.  As an outstanding debenture holder and shareholder to Concentric, this agreement is in breach of the debenture holders' rights regarding the sale of Concentric's core asset, the "Anderson Mine."  Concentric also failed to see its commitment to use reasonable efforts to see its shares trade on a Public Exchange.  Each of these events are, as outlined below in Section 8 of the Debenture, "Events of Default" of the Debenture.

No other grounds for accelerating the debentures are given in the Default Letters, and the Default Letters appear to be the sole basis for the Petitioners' claims against Concentric.

The Default Letters recognize that a default, alone, is insufficient to accelerate the debentures – Concentric must be given 120 days to cure any default.  The Convertible Debenture provides:  "If any Event of Default occurs and remains uncured for 120 days, the Holder may, at its sole discretion, provide to the Company a notice of acceleration of this Debenture."[21]

. . .

---

[20] A copy of the O'Shea Convertible Debenture is attached as Exhibit C to the Trustee Motion.
[21] *See* Exhibit C, § 8(b), to the Trustee Motion; *see also* Exhibit "I."



1    Notwithstanding this acknowledgement, the Default Letters are silent on when any
2    purported cure period expires for obtaining shareholder approval of the Global
3    Agreement.[22]  Assuming such a cure period is needed, it would run (at the earliest) from
4    the date the Global Agreement was signed – April 14, 2010 – and therefore expire 120
5    days later on August 12, 2010.
6    As for the "commercially reasonable" default, the Default Letters claim that the
7    120-day cure period for failure to use commercially reasonable efforts to publicly list the
8    Concentric stock began running from January 9, 2010, the date Concentric received
9    comments to its Amended Registration Statement from the SEC.[23]  This reading of the
10   Convertible Debenture is not only subject to a *bona fide* dispute, but it is plainly wrong.
11   The Convertible Debenture only requires Concentric to use "commercially reasonable"
12   efforts, which it did.  It is not a default under the Convertible Debenture if those
13   commercially reasonable efforts fail, as the Petitioners contend.

14   **D.    The $50,000 Payment Will Be Made On Time**

15   The Trustee Motion contends that Concentric does not have the ability to make a
16   $50,000 payment due to the Bureau of Land Management on August 30, 2010.[24]  This is
17   based on the Shareholder Update referenced above that was issued by former management
18   in January 2010.  That Update does not say that Concentric does not have the ability to
19   make the payment, just that if Concentric continued to pursue a "going public" effort, the
20   "principal risk" would be that it would run out of money and be unable to make the
21   $50,000 payment.  That effort has now ceased.  Additionally, the debt is not yet due and
22   Concentric contends that either it, or Global, will have the ability to pay that debt when it
23   does fall due.

24   **III.   LEGAL ARGUMENTS**

25   Bankruptcy Rule 1011(b) provides:  "Defenses and objections to the [involuntary]
26   petition shall be presented in the manner prescribed by Rule 12 Fed. R. Civ. P."  Rules

---

[22] *See id.*
[23] *See* Exhibit I to the Trustee Motion.
[24] Trustee Motion, ¶ 12.



12(b)(1) and (6) of the Federal Rules of Civil Procedure provide that a claim for relief may be dismissed for "lack of subject mater jurisdiction" and "failure to state a claim upon which relief can be granted." Standing is a threshold issue to be decided first in every case.[25] "[S]tanding is an aspect of subject matter jurisdiction and [] no matter how important the issue, a court lacking jurisdiction is powerless to reach the merits under Article III of the Constitution."[26] Likewise, a complaint is to be dismissed under Rule 12(b)(6) for either of two reasons: "(1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal claim." *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984).

The Involuntary Petition should be dismissed here because the Petitioners' claims are the subject of a *bona fide* dispute, and Concentric (or Global) can pay the $50,000 payment when it comes due. *See* 11 U.S.C. § 303(b) and (h)(1). Courts have recognized that a creditor's filing of an involuntary petition "must be carefully scrutinized by the Court because such action is extreme in nature and carries with it serious consequences to the alleged debtor." *In re Landmark Distrib., Inc.*, 189 B.R. 290, 306 (Bankr. D.N.J. 1995). Moreover, Congress crafted the Bankruptcy Code as "a shield for debtors, rather than as a sword for creditors." *Id.* (citing *In re R.N. Salem Corp.*, 29 B.R. 424 (S.D. Ohio 1983).

Accordingly, the Bankruptcy Code and courts provide safeguards for a debtor placed into an involuntary bankruptcy; namely, a petitioning creditor has the burden of establishing a *prima facie* case that its claims are not subject to a *bona fide* dispute, and that the alleged debtor is not paying its debts as they become due. *See In re Visioneering Constr.*, 661 F.2d 119, 121 (9th Cir. 1981); 11 U.S.C. § 303(b), 303(h)(1). Absent this *prima facie* showing, a creditor does not have standing to file an involuntary petition and his action should be dismissed. *In re Seko Inv., Inc.*, 156 F.3d 1005, 1007 (9th Cir. 1998).

---

[25] *See, e.g., Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197 (1975); *Simon v. Kentucky Welfare Rights Org.*, 426 U.S. 26, 37, 96 S. Ct. 1917 (1976); *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S. Ct. 669 (1974).

[26] *Fleck & Assocs. v. City of Phoenix*, 471 F.3d 1100, 1106 n.4 (9th Cir. 2006).



In this case, the Petitioners fail to establish their *prima facie* case where the facts – presented by their own Trustee Motion – demonstrate that: (1) their claims are subject to a *bona fide* dispute; and (2) the $50,000 BLM payment is not even due yet.

### A. The Claims Of The Petitioners Are The Subject Of A *Bona Fide* Dispute

In determining whether a creditor's claim is subject to a *bona fide* dispute, the Ninth Circuit has adopted an objective standard which "requires the bankruptcy court 'to determine whether there is an objective basis for either a factual or legal dispute as to the validity of the debtor.'" *In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057, 1064-65 (9th Cir. 2002) (quoting *In re Busick*, 831 F.2d 745, 750 (7th Cir. 1987)). In other words, "if there is either a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts, then the petition must be dismissed." *Id.* (quoting *In re Lough*, 57 B.R. 993, 996-97 (Bankr. E.D. Mich. 1986)).

Here, the purported accelerations of the Petitioners' debentures are ineffective because there was no legal basis to accelerate – hence, there is nothing due and there is no default. Section 9(d) of the Convertible Debenture provides that it is governed by New York law. In *Superior Fid. Assurance Ltd. v. Schwartz*, 893 N.Y.S.2d 256 (N.Y. App. Div. 2010), the court held that where the underlying note provided for notice and an opportunity to cure after default, the lender could not accelerate the amount due on the note by suing on the guaranties associated with the note. Because the opportunity to cure was not provided, the plaintiff "failed to demonstrate that it was owed the full amount of the promissory note." *Id.* at 258. This is in accord with the general rule that "[w]here a note by its terms requires notice of intent to accelerate if a default is not cured and an opportunity to cure the default, such requirement must be satisfied." 10 C.J.S. *Bills and Notes* § 131, at 253 (2008); *see also KIXX, Inc. v. Stallion Music, Inc.*, 610 P.2d 1385, 1388-89 (Utah 1980) (plaintiffs' exercise of option to accelerate was premature when it did not give 30 days to cure default as provided by promissory note); *Woodstock Rd. Inv. Props. v. Lacy*, 254 S.E.2d 910 (Ga. 1979) (same). At the very least, there is an objective



basis for either a factual or legal dispute as to the validity of alleged defaults and purportedly accelerated claims. Given the record the Petitioners have presented to the Court, they knew their claims would be in *bona fide* dispute.

        **1.** ***Shareholder approval is not needed for the Global Agreement and, even if it is, Concentric still has time to obtain it.***

The Default Letters first contend that there must be 50.1% shareholder approval of the Global Agreement. This basis for default is disputed for several reasons. First, it is not clear under the language of the Convertible Debenture that shareholder approval is needed for the Global Agreement to be effective. As noted above, the Global Agreement does not directly transfer Concentric's assets. Instead, it is a gradual process, that may or may not happen, depending on various contingencies. This does not constitute a default under Section 8(ix) of the Convertible Debenture, and the Petitioners should have known at the very least that any contention to the contrary would be subject to a *bona fide* dispute.

Second, the Convertible Debenture does not specify a timeframe for obtaining shareholder approval, if required. That is important because, as noted above, the Petitioners were well aware prior to filing the Involuntary Petition that the Global Agreement was not yet effective. Because the Global Agreement is not yet effective, there is no need for shareholder approval yet.

Finally, even if shareholder approval was required prior to entering into the Global Agreement, Concentric has 120 days to cure any default under the Convertible Debenture. Again, this point is recognized by the Petitioners, citing page 19 of the Convertible Debenture in the Trustee Motion, which states: "If any Event of Default occurs and remains uncured for 120 days, the Holder may, at its sole election, provide the Company notice of acceleration of this Debenture." This means Concentric has at least until August 14, 2010, to obtain shareholder approval, and perhaps longer if the cure period runs from the date Concentric first received the default notice in the O'Shea Letter. Thus, the purported acceleration was, at the very least, premature.

. . .



### 2. *Concentric's extensive efforts to publicly trade its stock were commercially reasonable.*

The Default Letters next contend that Concentric failed to use "commercially reasonable efforts" to have its common stock traded on a trading market. However, the Convertible Debenture does not define the term "commercially reasonable" and says nothing further about Concentric's "obligation." Based on this premise alone, the Convertible Debenture is vague and any purportedly accelerated claim arising under this default provision is by definition subject to differing legal and factual interpretations.

But more than that, the Exhibits attached to the Trustee Motion demonstrate that the efforts Concentric undertook to become public were extensive and any contention to the contrary would be vigorously disputed. To wit:

- Concentric filed an extensive Form S-1 Registration Statement with the SEC on December 31, 2008. An amended version of the Registration Statement is attached as Exhibit B to the Trustee Motion and is dated August 10, 2009. The Registration Statements alone are proof of Concentric's efforts to publicly list its stock.

- Concentric's efforts to go public came at the worst possible time in the economic history of the U.S. Very few companies were able to go public in 2008 and 2009.

- The SEC issued comments on the Registration Statement on January 9, 2010. This demonstrates that Concentric was heavily involved in the process of a public listing.

- On January 11, 2010, Concentric issued the "Shareholder Update" quoted above that described Concentric's efforts to publicly trade it stock and the reason those efforts were no longer viable after receiving the SEC comments.

The Petitioners knew of these efforts prior to accelerating their debentures in the Default Letters. Whether they agree or not that the efforts explained above were



1  "commercially reasonable," they knew or should have known that any contention to the
2  contrary is subject to a *bona fide* and vigorous dispute.

3      **B.**    **Speculation That Concentric Cannot Make The $50,000 Payment At
4  The End Of August 2010 Does Not Satisfy 11 U.S.C. § 303(h)(1)**

5      If the Court determines that the Petitioners' claims are the subject of a *bona fide*
6  dispute, the Involuntary Petition should be dismissed immediately and any inquiry under
7  11 U.S.C. § 303(h)(1) will be moot.  But, in the unlikely event the Court determines that
8  the Petitioners' claims are not the subject of a *bona fide* dispute, the Court should
9  nevertheless dismiss the Involuntary Petition because the Petitioners cannot satisfy their
10 burden under 11 U.S.C. § 303(h)(1), i.e. whether "the debtor is generally not paying such
11 debtor's debts as such debts become due unless such debts are the subject of a *bona fide*
12 dispute as to liability or amount."  The Ninth Circuit has adopted a totality of the
13 circumstances test for determining whether an alleged debtor is generally paying his debts
14 as they become due.  *In re Focus Media, Inc.*, 378 F. 3d. 916, 928-29 (9th Cir. 2004).
15 Under this test, a "finding that a debtor is generally not paying its debts 'requires a more
16 general showing than merely establishing the existence of a few unpaid debts.'"  *Id.* at 929
17 (quoting *Vortex*, 277 F.3d at 1072).  Moreover, "Congress intended to provide a flexibility
18 which is not reducible to a simplistic formula."  *In re Bishop, Baldwin, Rewald,*
19 *Dillinghaw & Wong, Inc.*, 779 F.2d 471, 475 (9th Cir. 1985).

20     Here, the Petitioners contend that Concentric is not paying its debts at they
21 generally become due because there is a possibility that a $50,000 payment to the Bureau
22 of Land Management due in August 2010 may not be made.  This is pure speculation and
23 conjecture at this time and, as noted above, disputed by Concentric – either it, or Global,
24 will have the ability to pay that debt when it comes due.

25     WHEREFORE, Concentric asks that the Involuntary Petition be dismissed in its
26 entirety, with prejudice, and that it be awarded all appropriate fees and costs associated
27 with bringing this Motion to Dismiss.

28 . . . .



RESPECTFULLY SUBMITTED this 12th day of July, 2010.

LEWIS AND ROCA LLP

By /s/ Scott K. Brown (#020390)
Susan M. Freeman
Scott K. Brown
*Attorneys for Concentric Energy Corp.*

COPY of the foregoing e-mailed
this 12th day of July, 2010 to:

Jonathan B. Frutkin
The Frutkin Law Firm, PLC
40 North Central Avenue, Suite 1400
Phoenix, AZ 85004
jfrutkin@frutkinlaw.com
*Attorney for Petitioning Creditors
John P. O'Shea; Richard Louise; AWM
Holding, LLC; David R. Holbrooke;
and Blue Sky Securities Ltd.*

COPY of the foregoing mailed
this 12th day of July, 2010 to:

Office of the U.S. Trustee
230 North First Avenue
Suite 204
Phoenix, AZ 85003


 /s/ Colleen J. Scruggs
Colleen J. Scruggs